**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| QORVIS HOLDING INC.,<br>529 14th Street, Suite 930<br>Washington, D.C. 20045,<br><br>Plaintiff,<br><br>v.<br><br>ÖZKAN YILMAZ,<br>Bijlmerdreef 412<br>Amsterdam, The Netherlands<br>(or such other foreign address as may be confirmed),<br><br>Defendant. | Civil Action No.<br><br>1:26-cv-2601<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Qorvis Holding Inc. ("Qorvis" or "Plaintiff"), by and through undersigned counsel, for its Complaint against Defendant Özkan Yilmaz ("Yilmaz" or "Defendant"), alleges as follows:

**NATURE OF THE ACTION**

1. This is an action arising from Defendant's misuse of his position as Qorvis's Chief Financial Officer to obtain unauthorized compensation, divert Company funds, misuse Company credit facilities, conceal his conduct, forge the Chief Executive Officer's signature on payment orders after his termination, and continue exerting unauthorized control over Company bank accounts and corporate authority.

2. The fraud was not isolated. It was carried out through specific invoices, ledger entries, payment requests, reconciliations, and forged authorizations, and was then followed by concealment efforts including disappearing messages and reliance on purported employment documents that, on information and belief, were fabricated or altered to support a retaliatory post-termination claim.

3. Plaintiff seeks damages, disgorgement, restitution, constructive-trust relief, declaratory relief, rescission and cancellation of Defendant's equity interest, contractual enforcement of the Shareholders Agreement, and preliminary and permanent injunctive relief.

4. Qorvis discovered Defendant's fraudulent scheme in March 2026 following an internal financial review triggered by irregularities in payment reconciliation and the service provider inquiry regarding the forged Payment Order Forms. Despite Defendant's efforts to conceal his misconduct through disappearing messages, restricted information access, and false accounting entries, Qorvis exercised reasonable diligence and discovered the fraud within months of its occurrence. This action is timely under all applicable statutes of limitation.

**THE PARTIES**

5. Plaintiff Qorvis Holding Inc. is a corporation incorporated under the laws of the District of Columbia, with its principal place of business at 529 14th Street, Suite 930, Washington, D.C. 20045. (Ex. 20 - Declaration of Matt Lauer at ¶2). Qorvis operates through related entities including Geopolitical Solutions LLC in Washington, D.C., GeoPols DMCC in Dubai, and Qorvis Business Services in the Kingdom of Saudi Arabia. (Ex. 20 - Declaration of Matt Lauer at ¶2).

6. Qorvis Holding Inc. owns and controls Geopolitical Solutions LLC, GeoPols DMCC, and Qorvis Business Services (collectively, the "Qorvis Group"), which are wholly owned and operated as a unified enterprise under common control, with shared management, commingled operations, and unified financial systems. Defendant's misconduct caused direct harm to Qorvis Holding Inc. through misappropriation of funds from accounts controlled by Qorvis Holding Inc., diversion of consolidated Group resources, and damage to the reputation and business relationships of the unified enterprise.

7. Defendant Özkan Yilmaz is an individual and foreign national and is a citizen and national of the Kingdom of the Netherlands who resides at Bijlmerdreef 412, Amsterdam, The Netherlands, and formerly served as Chief Financial Officer of Qorvis and/or the Qorvis Group. (Ex. 20 - Declaration of Matt Lauer at ¶3). Defendant holds or claims to hold an ownership interest in Qorvis and signed the executed November 10, 2023 Shareholders Agreement on behalf of SNOW Ventures L.L.C-FZ as its Director. (Ex. 4).

**JURISDICTION AND VENUE**

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because complete diversity of citizenship exists—Plaintiff is a citizen of the District of

Columbia and Defendant is a citizen of the Kingdom of the Netherlands—and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The damages sought include, at minimum, $60,000 in unauthorized "Additional Compensation," a $150,000 diverted payment recorded as a "BONUS," the value of improper Company-card expenditures, attempted post-termination payment fraud of $52,000, and, through a separate undisclosed Swiss-payroll scheme, at least CHF 24,000 in disguised salary reimbursements together with a further $15,000 that Defendant caused to be billed back to the Company, for a total well in excess of $277,000 exclusive of punitive damages, equitable relief, and attorney's fees.

9. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 because an actual and immediate controversy exists regarding Defendant's claimed authority, his continued interference with Company accounts and business relationships, and the status of his claimed ownership interest.

10. This Court has personal jurisdiction over Defendant under Federal Rule of Civil Procedure 4(k)(1)(A) and D.C. Code § 13-423(a) because Defendant transacted business in the District of Columbia, committed tortious acts within the District and directed at Plaintiff's District of Columbia operations, and contractually consented to jurisdiction in this District. Specifically, Defendant: (a) served as Chief Financial Officer of Qorvis, a District of Columbia corporation headquartered in the District; (b) executed the November 10, 2023 Shareholders Agreement expressly governed by District of Columbia law and containing a consent-to-jurisdiction provision; (c) exercised control over Qorvis's financial systems and directed fraudulent payments from the District of Columbia; and (d) caused harm to Qorvis that was felt in the District of Columbia where Qorvis maintains its principal place of business and corporate operations.

11. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff resides in this District, a substantial part of the conduct causing injury was directed to and felt in this District, and the Shareholders Agreement provides that any legal action regarding that Agreement shall be brought exclusively in the Superior Court of the District of Columbia or the United States District Court for the District of Columbia, if such court has jurisdiction.

12. To the extent Defendant asserts that Section 9.3 of the Shareholders Agreement requires arbitration of any claim in this action, that provision is unenforceable and inapplicable. (Ex. 4 at 9). First, the Shareholders Agreement itself recognizes that specific performance and injunctive relief are properly sought in a court of competent jurisdiction under Section 9.4. (Ex. 4 at 9). Second, Defendant's fraud, breach of fiduciary duty, conversion, and related tortious misconduct as a corporate officer and fiduciary arose independently of and prior to any contractual obligations under the

Shareholders Agreement. (Ex. 4). Third, Defendant's post-termination forgery, spoliation of evidence, and reliance on fabricated employment documents constitute a waiver of any arbitration rights and render any arbitration provision unenforceable as against public policy. (Ex. 4) Fourth, Qorvis seeks equitable remedies—including preliminary and permanent injunctive relief, constructive trust, and rescission of Defendant's equity interest—that require immediate court intervention to prevent irreparable harm and are not subject to arbitration.

## FACTUAL ALLEGATIONS

### A. Fiduciary Role and Control Over Financial Systems

13. Defendant served as Chief Financial Officer of Qorvis and/or the Qorvis Group. (Exhibit 1 at 3,5). (Ex. 20 - Declaration of Matt Lauer at ¶2). In that role, he exercised substantial control over the Company's accounting systems, QuickBooks records, payment approvals, reimbursement processes, vendor-payment channels, and Brex corporate credit card reconciliation. (Ex. 22 - Declaration of Maria Abad at ¶3).

14. As CFO, Defendant owed fiduciary duties of loyalty, care, candor, and full disclosure. He was required to act in Qorvis's best interests and to avoid self-dealing, unauthorized compensation, concealment, or misuse of Company funds.

15. Defendant's control over the entry and explanation of financial transactions gave him the practical ability to characterize payments, generate or submit invoices, and route transactions with limited independent review. He exploited that control.

### B. The Unauthorized "Additional Compensation" Payments

16. Qorvis's records reflect that Defendant had regular compensation of $12,000 per month. (Exhibit 11). By separate invoices and ledger entries, however, Defendant caused Qorvis to pay him an additional $15,000 per month on four occasions: March 31, 2025; April 30, 2025; May 30, 2025; and June 30, 2025. (Exhibit 5).

17. Each of those four payments was recorded in Qorvis's books as "Additional Compensation," and together they totaled $60,000. (Exhibit 5).

18. The bookkeeping detail associated with those payments is especially telling. The entries are memo-coded "50% of 30K," (Ex. 5) and the March 31, 2025 payment is expressly described as "50% of Sam's 30k who has a 10% shareholding." (Ex. 5 at 3). That language is inconsistent with any legitimate approved salary plan for Defendant and instead shows that the payment was being justified by reference to another stakeholder's compensation rather than by any Company-approved compensation arrangement. (Ex. 22 - Declaration of Maria Abad at ¶6)

19. The reference to “Sam’s 30k who has a 10% shareholding” in the March 31, 2025 (Ex. 5 at 3) payment memo demonstrates that Defendant was manufacturing justifications for unauthorized payments by referencing other stakeholders’ compensation rather than relying on any legitimate approval for his own compensation. This memo-coding shows that Defendant created false internal accounting narratives to disguise the unauthorized nature of the payments.

20. To procure those payments, Defendant submitted invoices characterizing each payment as “Additional Compensation” (Ex. 5) and caused them to be processed for payment through the financial systems he controlled, as though they were authorized compensation to which he was entitled. (Ex. 22 - Declaration of Maria Abad at ¶4-5). They were not. Mr. Lauer had not approved the four $15,000 payments, he did not authorize any compensation arrangement under which they would have been due, and the Board had not approved them either. (Ex. 20 - Declaration of Matt Lauer at ¶5).

21. Defendant’s June 5, 2025 invoice, for example, sought “Total Compensation for June 2025” of $12,000 plus an additional $6,025 for purported “Administration fees,” routing payment to Defendant’s Emirates NBD account in Dubai and attaching a DC Accountants & Consultants LLC pro forma invoice billed to GeoPols DMCC. (Ex. 11 at 19-20). The invoice thus bundled Defendant’s ordinary compensation with additional pass-through charges directed to his own bank account, further obscuring the nature of the requested payment.

**C. The $150,000 “BONUS” Entry Was a Mislabeling Used to Divert Funds**

22. Qorvis’s records further show a January 28, 2025 invoice, number 012025-2, in the amount of $150,000, paid to Defendant and described in the books as “Compensation January 2025 - BONUS.” (Ex. 6).

23. The Company’s accounting records separately indicate that this same payment “was for SNOW Ventures investment on 30 January 2025,” demonstrating that the $150,000 was not a genuine approved bonus owed to Defendant but instead was associated with an investment transaction.

24. The $150,000 was Company funds designated for investment in SNOW Ventures L.L.C-FZ, an entity Defendant controlled as Director. (Ex. 23 at 12). Rather than completing the investment transaction on behalf of Qorvis, Defendant diverted the funds to himself by causing the payment to be labeled and processed as a personal “BONUS,” thereby misappropriating Company investment capital. This mislabeling was intentional and designed to conceal the diversion of corporate funds intended for a legitimate business investment. (Ex. 20 - Declaration of Matt Lauer at ¶6).

**D. Misuse of the Brex Corporate Card and Self-Approval Through Reconciliation**

25. Defendant also used a Qorvis Brex corporate card ending in 5000 in his name to incur charges coded to Company accounts including Meals, Computer & Internet, Transportation & Airfare, Office Supplies, Other Professional Fees, Dues & Subscriptions, and Other Miscellaneous Expense. (Ex. 10).

26. The identified Card-5000 charges include recurring restaurant and café expenses, recurring Careem ride-hailing charges, charges to UAE real-estate or trustee-service providers, and subscription charges that appear personal in nature, including investing-newsletter subscriptions. (Ex. 10) These charges were coded to Company expense categories rather than segregated as personal spending. (Ex. 10)

27. Defendant did not enter descriptions for the Card-5000 charges, although Company policy required all employees to describe their charges. (Ex. 10) At the request of the Chief Executive Officer and the Board, Qorvis's Chief Operating Officer followed up with Defendant several times seeking further information about the charges, and Defendant did not provide any. (Ex. 22 - Declaration of Maria Abad at ¶12). Defendant's failure to describe the charges, and his non-response to those inquiries, deprived Qorvis of the information necessary to evaluate whether the charges were legitimate business expenses.

28. Because Defendant controlled or influenced the reconciliation and bookkeeping process, he was able to cause these charges to be entered and carried on the Company's books as business expenses. Qorvis's full review of the Brex ledger remains ongoing, and Plaintiff will prove the full amount of improper charges at trial.

**E. Termination for Cause and Lack of Any Post-Termination Authority**

29. On or about March 12, 2026, Qorvis terminated Defendant from all roles at Qorvis and its affiliates and subsidiaries. (Ex. 20 - Declaration of Matt Lauer at ¶4). Under Section 11.7 of the Shareholders Agreement, nothing in that Agreement gave Defendant any right to continued employment or limited Qorvis's right to discharge him at any time. (Ex. 4 at 12).

30. From and after March 12, 2026, Defendant had no actual authority, apparent authority, or other power to act for, commit, obligate, or bind Qorvis or any member of the Qorvis Group. (Ex. 20 - Declaration of Matt Lauer at ¶4).

**F. The $52,000 Post-Termination Invoice and Forged Payment-Order Fraud**

31. After his termination, Defendant contacted Qorvis service provider Fadi Al Khairy of Access KSA FZCO and sought payment of three invoices totaling $52,000. (Ex. 4 at 4); (Ex. 21 - Declaration of Fadi Al Khairy at ¶5). Those invoices were submitted on

or after March 13, 2026, even though they were dated January 27, 2026 and February 1, 2026. (Ex. 5); (Ex. 21 - Declaration of Fadi Al Khairy at ¶6)

32. The three invoices were: (i) a February 1, 2026 invoice from CBDBS LTD, 20 Birch Street, Colchester, England, in the amount of $20,000, directing payment to Zenus Bank in San Juan, Puerto Rico; (Ex. 7 at 2). (ii) a February 1, 2026 invoice from Roqqet International Media Limited, Agias Zonis 4, Limassol, Cyprus, in the amount of $17,000, directing payment to Portage Bank in Bellevue, Washington; (Ex. 7 at 3) and (iii) a January 27, 2026 invoice from Roqqet Media Ltd, 40 Dun Riabhach Park, Ashbourne, Limerick, Ireland, in the amount of $15,000, also directing payment to Portage Bank in Bellevue, Washington. (Ex. 7 at 4-5).

33. The two Roqqet invoices purported to come from separate entities in different countries, yet they listed the same U.S. banking institution and the same SWIFT/BIC code, -2XXX. (Ex. 7 at 3,5). On information and belief, that common-payment information was not coincidental and is evidence that the invoices were part of a common scheme rather than legitimate unrelated third-party charges.

34. After receiving those invoices, Mr. Al Khairy prepared three Payment Order Forms dated April 19, 2026 and asked Defendant to obtain the required Company signature approvals and return them. (Ex. 3); (Ex. 21 - Declaration of Fadi Al Khairy at ¶7)

35. On or about April 21, 2026, Defendant returned the three Payment Order Forms to Mr. Al Khairy via WhatsApp (Ex. 3at 3), purportedly signed by Qorvis CEO Matthew Lauer. (Ex. 21 - Declaration of Fadi Al Khairy at ¶8). The forms were numbered QOR 001, QOR 002, and QOR 003. (Ex. 2 at 2-4).

36. Mr. Lauer did not sign those Payment Order Forms, did not authorize his signature to appear on them, and had no knowledge of the transactions. (Ex. 20 - Declaration of Matt Lauer at ¶10). Defendant nevertheless returned the forms as though they were valid, intending that Qorvis's service provider rely on them and release Company funds. (Ex. 3); (Ex. 21 - Declaration of Fadi Al Khairy at ¶9).

37. The "who, what, when, where, and how" of this fraud are thus specific: Defendant Yilmaz, after his March 12, 2026 termination, transmitted to Fadi Al Khairy in April 2026 three previously submitted invoices totaling $52,000 together with three Payment Order Forms bearing forged Matthew Lauer signatures, using WhatsApp to create the appearance of executive authorization for payments that Qorvis had never approved. (Ex. 3 – WhatsApp conversation between Fadi and Defendant; Ex. 2 – payment order forms).

**G. Defendant's Control of Bank Access and Instructions To Move Funds**

38. Defendant also exercised extraordinary unilateral control over Company banking relationships and fund flows. In a January 2026 message, Defendant wrote: "But yes, you'll have to transfer the funds from FAB," followed immediately by "No one else can do this." (Ex. 12). In the same message thread he forwarded a recommendation to transfer $1.5 million from FAB and $0.5 million from Zand to Qorvis because, according to him, "we are structurally short." (Ex. 12).

39. These messages show both Defendant's involvement in directing substantial inter-entity fund movements and his view that key financial controls or authenticator access were concentrated in him or under his control.

40. Defendant was also reflected as the sole signatory on Company WIO Bank accounts held in the name of GeoPols DMCC, using his own personal email and telephone number, including the principal account ending in XXX3553. (Ex. 22 - Declaration of Maria Abad at ¶16). This exclusive signatory arrangement impeded the Company's access to its own funds after Defendant's termination. (Ex. 22 - Declaration of Maria Abad at ¶16)

**H. Spoliation Through Disappearing Messages**

41. When Mr. Al Khairy later reviewed his WhatsApp correspondence with Defendant, all messages between March 13 and April 30, 2026 had been deleted, leaving no record of Defendant's efforts to collect payment on the invoices. (Ex. 3); (Ex. 21 - Declaration of Fadi Al Khairy at ¶11). It appeared that Defendant had turned on WhatsApp's "disappearing messages" function on March 13, 2026 — immediately after his termination. (Ex. 3); (Ex. 21 - Declaration of Fadi Al Khairy at ¶11).

42. On information and belief, Defendant enabled disappearing messages to conceal evidence of his post-termination payment scheme and to hinder subsequent investigation and recovery.

**I. Retaliatory DMCC Claim Supported by Purported Employment Documents**

43. After Qorvis terminated him for cause, Defendant initiated a claim at the DMCC Disputes Centre, request number 7382950, seeking AED 1,750,000 in alleged unpaid salary for May 8, 2023 through April 30, 2026 plus AED 150,000 in leave pay, for a total of AED 1,900,000. (Ex. 14 at 2).

44. That claim is inconsistent with the Company's records reflecting substantial compensation and other payments already made to Defendant during the same period.

45. In support of the DMCC claim, Defendant produced a purported Employment Agreement dated February 4, 2021 (Ex. 15) and a related Job Offer Letter (Ex. 16). On information and belief based on Qorvis's corporate records, the testimony of CEO

Matthew Lauer, (Ex. 20 - Declaration of Matt Lauer at ¶11) and inconsistencies in the documents themselves, these documents are fabricated or materially altered. (Ex. 20). Specifically, the purported Employment Agreement recites a February 4, 2021 commencement date that does not match the Company's actual operating structure and the timeline reflected by the parties' dealings and public announcements (Ex. 1); the documents contain terms contradicting contemporaneous communications between Defendant and Company management; the signature characteristics are inconsistent with genuine Matthew Lauer signatures on authenticated Company documents; and the purported Employment Agreement was never maintained in Qorvis's corporate files or referenced in any Board resolution or compensation approval.

46. The timing and content of those documents, together with the forged payment orders, reflect a continuing pattern: when Defendant could no longer extract funds internally, he shifted to forged authorizations and then to a retaliatory external compensation claim based on suspect documents.

**J. The Undisclosed Swiss Payroll Scheme Through Q-Consulting Switzerland**

47. In a separate scheme that Qorvis discovered after Defendant's termination, Defendant, while serving as Chief Financial Officer, arranged to be placed on the payroll of Q-Consulting Switzerland Sàrl ("QCS"), a Geneva-based vendor, under a formal written employment contract, and caused Qorvis to fund his Swiss salary without disclosing the arrangement to the Company's Chief Executive Officer or Board of Directors. (Ex. 17).

48. Defendant caused QCS to bill Qorvis for his Swiss employment costs—approximately CHF 8,000 per month—by embedding that amount in QCS's monthly expense reports to Qorvis under the false description "Additional PR Services – workstream 2." (Ex. 8). Qorvis reimbursed three such charges, reflected on the QCS expense reports for April, May, and June 2025 and totaling CHF 24,000, in the belief that it was paying for legitimate public-relations services rather than Defendant's personal salary. (Ex. 8); (Ex. 22 - Declaration of Maria Abad at ¶9).

49. Defendant personally directed and confirmed the disguised charge. On May 1, 2025, QCS's principal, Benoît Lioud, transmitted the April 2025 QCS invoice and asked Defendant to confirm whether the additional line "related to workstream 2" was acceptable; Defendant replied, "Yes agreed as discussed," copying Qorvis COO Maria Abad. (Ex. 18); (Ex. 22 - Declaration of Maria Abad at ¶10). Defendant represented to Ms. Abad only that the line item was for "another workstream" that had been approved for processing, and did not disclose that it in fact funded his own Swiss salary. (Ex. 22 - Declaration of Maria Abad at ¶9).

50. Neither CEO Matthew Lauer nor the Board authorized a formal QCS employment contract for Defendant or approved Qorvis's reimbursement of his Swiss salary. (Ex. 20 - Declaration of Matt Lauer at ¶7-8).Mr. Lauer understood only that Defendant needed assistance with his Swiss residency and that it was acceptable for Defendant to seek Mr. Lioud's support; Mr. Lauer was not aware that a formal employment contract had issued or that Qorvis had reimbursed QCS for Defendant's Swiss salary for three months. (Ex. 20 - Declaration of Matt Lauer at ¶7).

51. Defendant resigned from QCS by letter dated July 29, 2025, effective at the end of August 2025, and the QCS employment contract was terminated. (Ex. 19). For July and August 2025, Defendant shifted his Swiss employment costs to SNOW Ventures L.L.C-FZ—the entity Defendant controlled as Director—through a QCS invoice dated August 25, 2025 in the amount of CHF 16,000 that referenced a purported "Service agreement dated August 14." (Ex. 9); (Ex. 22 - Declaration of Maria Abad at ¶11).

52. After Qorvis discovered the scheme, Defendant worked to unwind the QCS arrangement with the Swiss vendor, but nonetheless succeeded in causing an additional $15,000 to be billed back to Qorvis. (Ex. 9). That $15,000 represents additional Company funds misappropriated through the scheme, in addition to the CHF 24,000 in disguised reimbursements Qorvis had already paid. (Ex. 8).

**COUNT I**

**FRAUD**

53. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

54. Defendant made multiple false representations of material fact to Qorvis and its agents, including but not limited to: (a) that the four $15,000 payments he invoiced and caused to be paid to himself in March through June 2025 as "Additional Compensation" were authorized compensation to which he was entitled (Ex. 5); (b) that the $150,000 January 28, 2025 payment labeled "Compensation January 2025 - BONUS" was a legitimate bonus owed to him (Ex. 6); and (c) that the three Payment Order Forms returned on or about April 21, 2026 genuinely bore Matthew Lauer's signature and authorized payment of the three invoices totaling $52,000 (Ex. 2).

55. Defendant made these misrepresentations knowingly and intentionally. He knew the four $15,000 payments had not been approved by Mr. Lauer or the Board; he knew the $150,000 payment was not an approved bonus; and he knew Mr. Lauer had not signed the Payment Order Forms that Defendant returned via WhatsApp.

56. Defendant made the misrepresentations for the purpose of inducing action by Qorvis and its agents — namely, to cause Qorvis to pay him unauthorized funds, to code and carry those payments on its books as legitimate compensation or expenses, and to cause a service provider to release an additional $52,000 in Company funds after his termination.

57. Qorvis and its personnel reasonably relied on Defendant's representations, at least initially, because Defendant was the acting CFO, controlled the relevant financial systems, held himself out as the person with authority over these matters, and presented the transactions as already approved or duly authorized.

58. As a direct and proximate result, Qorvis suffered damages including, at minimum, the $60,000 in unauthorized Additional Compensation (Ex. 5), the $150,000 misdirected through the false "BONUS" entry (Ex. 6), investigative and remediation costs, and the value of any additional improper payments or expenses proven at trial.

59. In addition to the $210,000 in direct misappropriated funds identified above, and the additional losses from the undisclosed Swiss-payroll scheme described in Section J above (at least CHF 24,000 in disguised reimbursements plus a further $15,000 billed back to the Company) (Ex. 9 – disguised reimbursements, Ex. 9 – QCS/SNOW Ventures Invoice $15,000), Qorvis has incurred and continues to incur substantial additional damages, including: (a) forensic accounting and investigation costs; (b) legal fees and expenses related to defense of the DMCC proceeding and investigation of Defendant's fraudulent documents; (c) costs to remediate unauthorized bank access and restore financial controls over Company accounts; (d) business disruption and lost opportunities due to diverted management attention and damaged business relationships with service providers and financial institutions; and (e) reputational harm to Qorvis's standing with clients, partners, and financial institutions. The full amount of these damages will be proven at trial.

## COUNT II

## FRAUDULENT CONCEALMENT

60. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

61. Defendant had a duty to disclose material facts to Qorvis by virtue of his role as CFO and fiduciary, including a duty to disclose unauthorized compensation arrangements, the true basis of payments to himself, the personal nature of Company-card charges, the lack of genuine approval for payment requests, and the absence of authenticity in any authorization he transmitted on behalf of the Company.

62. Instead, Defendant concealed those material facts by mislabeling transactions, bundling charges into invoices paid to his personal bank account, using Company-book coding to disguise expenses, and enabling disappearing messages to eliminate a communications record relevant to the $52,000 invoice-payment scheme.

63. Qorvis was thereby hindered in timely discovering the full scope of Defendant's misconduct and suffered damages as a result.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**

64. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

65. As CFO, Defendant owed Qorvis fiduciary duties of loyalty, care, candor, good faith, and full disclosure.

66. Defendant breached those duties by, among other things, causing unauthorized compensation to be paid to himself; diverting the $150,000 SNOW Ventures-related funds through a false "BONUS" designation (Ex. 6); causing Qorvis to fund his undisclosed Swiss salary through Q-Consulting Switzerland by disguising it as "PR services" (Ex. 8); misusing the Company's Brex card and self-approving or facilitating the coding of those charges as business expenses (Ex. 10); forging or causing the forgery of the CEO's signature on Payment Order Forms (Ex. 2); trying to extract an additional $52,000 after termination (Ex. 2, Ex. 3); maintaining unauthorized control over Company bank accounts; and concealing or destroying evidence.

67. As a direct and proximate result, Qorvis suffered damages and Defendant was unjustly enriched. Plaintiff is entitled to compensatory damages, disgorgement, equitable relief, and a constructive trust over wrongfully obtained funds or benefits.

**COUNT IV**

**CONVERSION**

68. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

69. Qorvis had an immediate possessory right to its funds, including the $60,000 in unauthorized Additional Compensation (Ex. 5), the $150,000 falsely characterized as a bonus (Ex. 6), the CHF 24,000 and additional $15,000 in Company funds paid through the undisclosed Swiss-payroll scheme (Ex. 8, Ex. 9), and all Company funds used to pay Defendant's improper expenses (Ex. 10).

70. Defendant intentionally exercised dominion and control over those funds in a manner inconsistent with Qorvis's rights and further attempted to convert an additional $52,000 through the forged Payment Order Forms (Ex. 2).

71. Plaintiff is entitled to recover all converted amounts, plus interest and other available relief.

**COUNT V**

**UNJUST ENRICHMENT / DISGORGEMENT**

72. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

73. To the extent Defendant's misconduct occurred outside the scope of any enforceable contractual obligation, or to the extent any purported employment agreement is void due to fraud or fabrication, Defendant obtained money, benefits, expense payments, control advantages, and other value from Qorvis under circumstances that make it unjust for him to retain them. Defendant was enriched by receiving the unauthorized compensation, diverted funds, and improper expense reimbursements; Qorvis was correspondingly impoverished; the enrichment and impoverishment were causally connected; and there is no justification for Defendant's retention of these benefits.

74. Plaintiff is entitled to restitution, disgorgement, and other equitable relief in an amount to be proven at trial.

**COUNT VI**

**DECLARATORY JUDGMENT**

75. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

76. An actual and justiciable controversy exists regarding whether Defendant has any ongoing authority to act for, bind, or represent Qorvis or any Qorvis-related entity, and regarding whether he may continue to assert control over Company accounts, relationships, or purported entitlements.

77. Plaintiff is entitled to a declaration that Defendant has no right, power, or authority to act for or bind Plaintiff or any related entity in any respect.

**COUNT VII**

**EQUITABLE RESCISSION, CANCELLATION OF EQUITY INTEREST, AND CONTRACTUAL ENFORCEMENT**

78. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

79. Defendant signed and is bound by the Qorvis Shareholders Agreement (Ex. 4), which is governed by District of Columbia law, recognizes the availability of specific performance in a court of competent jurisdiction, and provides that the Company may compel a violating shareholder or transferee to deliver shares in accordance with the Agreement.

80. The Shareholders Agreement requires shareholders to act in the best interests of the Company and prohibits conduct adverse to the Company's interests. Defendant's fraud, embezzlement, breach of fiduciary duty as Chief Financial Officer, forgery of corporate authorizations, and spoliation of evidence constitute material breaches of the Shareholders Agreement and violations of his duties as a shareholder. These breaches taint Defendant's acquisition and continued retention of any ownership interest in Qorvis and constitute grounds for equitable rescission, cancellation, forfeiture, and repurchase of Defendant's equity interest. Under the Shareholders Agreement, such breaches entitle Qorvis to compel transfer of Defendant's shares and to specific performance of Defendant's obligations.

81. Plaintiff seeks, among other relief, an order compelling Defendant to relinquish or transfer any equity interest he holds or claims, and directing that the Company's books and records be updated accordingly.

## COUNT VIII

## INJUNCTIVE RELIEF

82. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

83. Defendant's ongoing conduct and asserted authority threaten immediate and irreparable injury, including risk of further misuse of Company identity, bank access, documents, confidential information, and evidence.

84. Money damages alone are inadequate because Defendant has already shown a willingness to use forged authorizations, conceal communications, and leverage unauthorized control over Company banking access.

85. Plaintiff is entitled to preliminary and permanent injunctive relief restraining Defendant from acting or purporting to act for Qorvis, from accessing or controlling Company funds or accounts, from relying on fabricated documents as Company-authorized instruments, and from destroying, concealing, or altering relevant evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant and grant the following relief:

• Declare that Defendant lacks any authority to act for, bind, or represent Qorvis or any related entity;

• Award compensatory damages in an amount to be proven at trial, including at least $210,000 representing the $60,000 in unauthorized Additional Compensation and the $150,000 false “BONUS” payment, the additional funds misappropriated through the undisclosed Swiss-payroll scheme (at least CHF 24,000 in disguised reimbursements plus a further $15,000 billed back to the Company), plus the value of improper Company-card expenditures and other misappropriated funds;

• Award disgorgement, restitution, and impose a constructive trust over all wrongful gains, benefits, or assets traceable to Defendant’s misconduct;

• Award punitive damages in an amount sufficient to punish Defendant’s willful, malicious, and fraudulent misconduct—including the knowing misappropriation of Company funds through false invoices and ledger entries, the deliberate forgery of the CEO’s signature on Payment Order Forms, the intentional spoliation of evidence through disappearing messages, and the submission of fabricated employment documents in a retaliatory claim—and to deter similar conduct, to the extent permitted by law;

• Rescind, cancel, forfeit, repurchase, or otherwise divest Defendant’s claimed equity interest in Qorvis, and compel all acts necessary to update the Company’s books and records accordingly;

• Issue preliminary and permanent injunctive relief:

• (a) barring Defendant from representing himself as an officer, director, employee, agent, or representative of Qorvis Holding Inc. or any related entity;

• (b) barring Defendant from accessing, transferring, withdrawing, or exercising any control over any bank account, financial account, or asset held in the name of Qorvis Holding Inc., Geopolitical Solutions LLC, GeoPols DMCC, Qorvis Business Services, or any related entity;

• (c) requiring Defendant to immediately surrender all passwords, authenticator codes, signing authority, and access credentials for any account held by or on behalf of Qorvis or its affiliates;

• (d) barring Defendant from destroying, deleting, concealing, altering, or disposing of any documents, electronic communications, financial records, or other evidence relating to his employment, compensation, Company financial transactions, or the claims in this action;

• (e) requiring Defendant to preserve and produce all WhatsApp communications, disappearing messages, and other electronic evidence in his possession or control; and

• (f) barring Defendant from initiating or pursuing any claims against Qorvis or its affiliates based on fabricated, altered, or fraudulent documents;

• Award Plaintiff its reasonable attorneys' fees, costs of suit, and expenses to the fullest extent permitted by law, equity, or contract, including fees incurred in defending the retaliatory DMCC claim based on fabricated employment documents;

• Award Plaintiff pre-judgment interest from the date of each wrongful payment through the date of judgment, and post-judgment interest at the rate provided under 28 U.S.C. § 1961; and

• Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 23, 2026

Respectfully submitted,

Sarah Gilcrest

Sarah Gilcrest (D.C. Bar No. 1672792)

CHALMERS ADAMS BACKER & WALLEN LLC

Counsel for Plaintiff Qorvis Holding Inc.